IT IS FURTHER ORDERED that Defendant's Motion to Dismiss Counts VII and VIII is **DENIED.** [5–3]

FIRST NATIONAL BANK OF
OMAHA, Plaintiff,

v.

THREE DIMENSION SYSTEMS
PRODUCTS, INC.,
Defendant.

Three Dimension Systems Products,
Inc., Counterclaimant,

v.

First National Bank Of Omaha,
Counterdefendant.

No. 8:98CV569.

United States District Court,
D. Nebraska.

Dec. 7, 1999.

Bartholomew McLeay, Omaha, NE, for Plaintiff.

John R. Douglas, Omaha, NE, for Defendant.

## MEMORANDUM AND ORDER

BATAILLON, District Judge.

### I. Introduction

On September 24, 1999, I filed a memorandum and order (Filing No. 50) in this case granting the plaintiff partial summary judgment. The defendant subsequently filed a motion to reconsider (Filing No. 61). After reconsidering the arguments raised in the parties' briefs, as well as the arguments presented at a hearing on the motion held on October 13, 1999, I hereby withdraw my previous memorandum and order.

Therefore, the matter before the court, once again, is the motion (Filing No. 11) by defendant/counterclaimant Three Dimension Systems Products, Inc. ("3D") for partial summary judgment. In support of its motion, 3D has submitted an index of evidence (Filing No. 12) as well as a brief, a reply brief, and a supplemental index of

evidence (Filing No. 33). In opposition to the motion for partial summary judgment, the plaintiff/counter-defendant First National Bank of Omaha ("FNBO") has submitted an index of evidence (Filing No. 28) and an opposition brief. After careful consideration of the transcript (Filing No. 79) of the hearing on the motion to reconsider as well as the evidence and arguments supporting both the motion for summary judgment and the motion for reconsideration, I deny the plaintiff's motion for partial summary judgment

## II. Factual Summary

The defendant/counterclaimant 3D is an Arizona corporation engaged in the business of developing computer software programs. FNBO is a national banking association organized and existing under the laws of the United States and located in Omaha, Nebraska. In 1996, 3D and FNBO entered into a series of agreements to have 3D customize, license, and maintain banking application software for FNBO. In addition to executing a Program Products and Services Master Agreement ("Master Agreement"), 3D and FNBO agreed that the following documents were to "become a part of and ... governed by" the terms of the Master Agreement: Addendum 3D–FNBO–ADD001; Addendum 3D–FNBO–ADD0001A ("Addendum 1A"); Integrity Warranty and Indemnity Agreement; License Schedule Number 3D–FNBO–LS001; License Schedule Number 3D–FNBO–LS002; Service Schedule Number 3D–FNBO–SS001; Service Schedule Number 3D–FNBO–SS002; and Service Schedule Number 3D–FNBO–SS003. Filing No. 36, Second Amended Complaint at 3, ¶ 7(a)-(h).

The Master Agreement as amended by Addendum 3D–FNBO–ADD0001A provided for a thirty-day opportunity to cure claimed breaches. The provision provided in relevant part:

Either party may terminate any Schedule hereunder for cause after notifying the other party in writing of such cause and allowing the other party a reasonable period of time, no less than thirty working days, to correct or eliminate the cause. It is specifically agreed by the parties that termination of any Schedule under this Agreement may only be made by the non-breaching party based on the other party's material default in its obligations with regard to that Schedule. Default with regard to one Schedule shall not be deemed to result in an automatic default under any other Schedule.

Filing No. 12, Defendant/Counterclaimant's Index, Ex. 5, Addendum 3D–FNBO–ADD0001A at ¶ 2, amending Ex. 1, Master Agreement at 9, ¶ 27.

The contracts concern three banking application software programs: Platform Processing System, Vantage Teller, and Vantage Platform. At the time this dispute arose, 3D had developed and installed the Platform Processing System and Vantage Teller software at FNBO. This action arises out of the development of the second phase of the Vantage System software, the Vantage Platform.

On or about October 19, 1998, 3D delivered the first stage of the Platform software to FNBO. 3D did not include with this delivery the required cover letter that set the date by which FNBO had to report to 3D any errors it discovered in the first stage. The contract provided:

[FNBO] will test each deliverable or code correction in a timely manner and either report problems to 3D or return to 3D a signed letter of acceptance of such deliverable on or before a mutually agreed upon date which will be cited in a cover letter accompanying the deliverable. Such deliverables or code corrections will be considered approved and accepted without change by [FNBO] in the event the letter of acceptance or error report is not received by 3D on or before the mutually agreed upon date.

Filing No. 12, Defendant/Counterclaimant's Index, Ex. 3, License Schedule No. 3D–FNBO–LS002, ¶ 2.4.1(3). Despite this contract language, however, 3D claims— and FNBO strenuously denies—that the parties orally agreed that FNBO would

document any claimed errors within ten days of the date of delivery.

FNBO claims that it immediately experienced difficulties with the Platform software, even losing three days of inputted data when the system crashed. 3D claims that within the allegedly agreed-upon time frame of ten days, FNBO reported only three errors. But on November 2–3, 1998, FNBO reported to 3D seventy-three "errors" it had found in the software. The contract required 3D to correct errors that FNBO reported in a "timely and prompt manner," then resubmit corrected computer code for further testing. *Id.*, ¶ 6. Instead, 3D notified FNBO in writing that it would not correct the errors identified by FNBO because they were reported more than ten days after delivery of Stage 1 of the Platform software.

On November 10, 1998, FNBO unilaterally disabled the remote communication facility between 3D and FNBO's mainframe computer that had been in place since the fourth quarter of 1996, thereby preventing 3D access to its Platform software on FNBO's computer. On November 23, 1998, FNBO filed this lawsuit seeking to collect damages for 3D's breach of the Master Agreement. 3D contends that prior to filing the suit, FNBO gave 3D no oral or written notice of cause to terminate the Master Agreement or any Schedule, nor did it provide 3D with any opportunity to cure the problems with Stage 1 of the Platform software.

On the same day that FNBO filed its breach of contract action, Robert C. Boyle, president of 3D, sent a letter to FNBO as official notice that 3D considered FNBO "in significant and material default under the Agreement and Schedules." Filing. No. 28, 3D's Supp. Index of Evidence, Supp. Boyle Aff., Ex. 8. Boyle explained that he was giving written notice of default as required by the contract and allowing FNBO thirty days to cure. The contract gave either party the right to terminate a contract schedule "for cause after notifying the other party in writing of such cause and allowing the other party a reasonable period of time, not less than 30 working days, to correct or eliminate the cause." Filing No. 12, Defendant/Counterclaimant's Index, Ex. 1 at 9, ¶ 27.

Boyle's letter defined four areas of concern: 1) FNBO's failure to pay allegedly overdue invoices; 2) FNBO's disabling of the remote communications facility on November 10; 3) FNBO's alleged failure to use correct reporting procedures for errors or to distinguish correctly between true "errors" in the Vantage Platform system and mere changes needed because FNBO personnel had made mistakes when they originally submitted specifications to 3D for the Vantage Platform system; and 4) the delays caused by FNBO's actions or inactions. The final paragraph of the letter expresses Boyle's commitment to completing 3D's contractual obligations or, if FNBO succeeded in curing its defaults, negotiating amendments to the contract. Filing No. 28, 3D's Supp. Index, Boyle Aff., Ex. 8 at 5.

Unmoved by Boyle's letter, FNBO elected to continue this suit.

3D now moves for partial summary judgment on the narrow issue of whether FNBO's failure to give 3D notice and an opportunity to cure the errors constitutes a material breach of contract. 3D argues that FNBO materially breached the Master Agreement based on the plain language of the contract.

In opposing partial summary judgment, FNBO argues that it has not breached any duty to provide 3D with notice and an opportunity to cure, whether contractual or by operation of law. FNBO also argues that the issue of whether any alleged breach of notice and opportunity to cure occurred constitutes a genuine issue of material fact inappropriate for resolution on a motion for summary judgment.

## II. Legal Standards

### A. Motion to Reconsider

The Federal Rules of Civil Procedure do not allow motions to reconsider. Federal Rule of Civil Procedure 59(e), however, does permit a party to file a motion to

alter or amend judgment within ten days after entry of judgment. Hence, I shall construe FNBO's motion to reconsider, filed within ten days of my entry of summary judgment, as a Rule 59(e) motion.

### B. Summary Judgment

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court grants summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter; rather, the court must determine whether a genuine issue exists for trial. The Eighth Circuit has recognized that primarily legal issues and particularly questions of contract interpretation are issues amenable to summary disposition. *See, e.g., Mansker v. TMG Life Ins. Co.,* 54 F.3d 1322, 1326 (8th Cir.1995); *Mumford v. Godfried,* 52 F.3d 756, 759 (8th Cir.1995); and *Crain v. Board of Police Commissioners,* 920 F.2d 1402, 1405–06 (8th Cir.1990). Therefore, because the issues presented for resolution are essentially legal in nature—contract law interpretation—summary disposition of this case is appropriate.

### III. Choice of Law

■ "[W]hen parties bind themselves by a lawful contract, a court must give effect to that contract as written if the terms are clear and unambiguous." *Mechanical Air Engineering Co. v. Totem Const. Co.,* 801 P.2d 426, 428 (Ariz.App.1989) (*quoting Estes Co. v. Aztec Const., Inc.,* 139 Ariz. 166, 677 P.2d 939, 941 (Ariz.App.1983)). The Master Agreement plainly provides that the Agreement and any Schedules shall be governed by the laws of the State of Arizona. Filing No. 12, Ex.1 at 12, ¶ 41. Arizona courts follow the Restatement (Second) of Contracts in the absence of contrary authority. *Creative Learning Sys., Inc. v. Arizona,* 166 Ariz. 63, 800 P.2d 50, 52 (Ariz.Ct.App.1990).

### IV. Discussion

■ 3D asks for partial summary judgment on the claim that FNBO breached the contract when it failed to provide 3D with written notice of 3D's alleged breach and an opportunity to cure before instituting this action for breach of contract. FNBO responds that it was not required to provide 3D with written notice or an opportunity to cure before filing suit for breach because 3D repudiated the contract when 3D announced it would not correct the seventy-three alleged errors in Stage 1 of the Platform software. Genuine issues of material fact remain to be resolved on each party's position; hence, 3D's motion for partial summary judgment is denied.

While it is true that the contract allowed either party to terminate a Schedule for cause only upon written notice and an opportunity to cure, an observation that justifies 3D's litigation stance, it is also true that the contract required 3D to transmit with each delivery a cover letter that gave a mutually agreed upon date by which FNBO had to report errors or return a signed acceptance. 3D's failure to transmit this cover letter when it delivered Stage 1 of the Platform software on October 19, 1998, obviously justifies FNBO's position. 3D claims, however, that the parties had orally modified the cover letter requirement by agreeing that FNBO would have ten days from the date of delivery to report errors to 3D. FNBO, predictably, vehemently denies that the parties ever reached such an oral agreement. Clearly, a genuine issue of material fact exists concerning the date by which FNBO was expected to report errors to 3D.

■ This date is significant because 3D subsequently refused to correct errors FNBO reported after the ten days following delivery had passed. FNBO contends that it was entitled to take 3D at its word that the Stage 1 errors would not be corrected and then to assume, since later

stages of the Platform software depended on the proper functioning of Stage 1, that 3D had repudiated the remainder of the contract. A contract is anticipatorily breached "where the repudiating party expresses a positive and unequivocal manifestation that [it] will not render the required performance when it is due." *Oldenburger v. Del E. Webb Development Co.*, 159 Ariz. 129, 765 P.2d 531, 533 (Ariz. App.1988). FNBO claims that 3D's announcement that it would not correct errors represents just such a positive and unequivocal manifestation.

I find that the situation between the parties following delivery of Stage 1 is not nearly as cut-and-dried factually as the parties' insist. 3D claims that when errors were found in earlier products delivered to FNBO, the parties worked out the claims and changes to both parties' satisfaction. Defendant's Brief at 5. But delivery of Stage 1 evidently put special pressures on the parties' relationship. FNBO and 3D, each unhappy with the other's performance, appear to have engaged in a game of bluster, presumably with the intent of forcing compliance with various contract demands. When FNBO submitted seventy-three alleged errors, 3D claimed the errors were submitted too late and demanded that certain unpaid invoices be paid immediately. FNBO then unilaterally disabled the communication line between 3D and FNBO's mainframe computer, preventing 3D from addressing any of the claimed errors. Finally, FNBO played its trump card by filing suit for anticipatory breach. That filing occurred on the very day that 3D sent a notice of breach letter to FNBO that nevertheless expressed the hope that the parties' differences could be ironed out—which, on the surface, at least, is hardly the sentiment of a party who repudiated a contract.

Upon further review, I find that this disagreement is not a scenario that permits me to find, as a matter of law, that 3D either did or did not manifest a positive and unequivocal intent to repudiate a contract. Nor does the scenario permit me to find, as a matter of law, that by filing its preemptive suit, FNBO materially breached the contract by failing to provide 3D with written notice and an opportunity to cure. These are factual questions for jury. The jury must determine whether 1) the parties reached an oral agreement about the date by which FNBO had to report errors to 3D, and 2) whether 3D's refusal to fix errors reported more than ten days after delivery was an anticipatory breach that nullified FNBO's duty to provide the notice and an opportunity to cure. Accordingly,

IT IS ORDERED that

1) The memorandum and order of September 24, 1999 (Filing No. 50) is withdrawn;

2) The motion (Filing No. 61) for reconsideration by plaintiff/counterdefendant First National Bank of Omaha is granted; and

3) The motion (Filing No. 11) by defendant/counterclaimant Three Dimension Systems Products, Inc., for partial summary judgment is denied.